UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RICHARD WOODALL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:16CV350 PLC |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff Richard Woodall seeks review of the decision of the Social Security Commissioner, Nancy Berryhill, denying his application for Disability Insurance Benefits under the Social Security Act.[2] Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's application.

### I. *Background and Procedural History*

On November 15, 2012, Plaintiff filed an application for Disability Insurance Benefits alleging he was disabled as of October 24, 2012[3] as a result of: "complete blockage on right side of heart," heart attack, high blood pressure, high cholesterol, and obesity. (Tr. 149-50, 168, 175).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 9).
[3] Plaintiff originally alleged that his date of onset was January 1, 2008. (Tr. 74). He later amended the date to October 24, 2012. (Tr. 168).

The Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 90-94, 97-98).

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing on January 16, 2015. (Tr. 30-72). At the hearing, Plaintiff testified that he was born on March 9, 1968, lived with his mother, was six feet tall, and weighed 426 pounds. (Tr. 36). When the ALJ asked Plaintiff whether his weight fluctuated, he answered, "I've always been real big all my life." (Id.). Plaintiff dropped out of school in eighth grade and had no vocational training, licenses, or certifications for work. (Tr. 38-39).

Plaintiff had a driver's license and drove himself and his mother to doctor appointments and the grocery store, but driving more than fifty to sixty miles caused his back to hurt and his leg to "fall sleep." (Tr. 37). Since October 24, 2012, his alleged date of onset, he performed maintenance work at RV Horizons "for like three weeks, and they got rid of me." (Tr. 39). At that job, Plaintiff was only able to carry "a little small toolbox" and had difficulties "moving hot water tanks, and stuff like that." (Tr. 40). Plaintiff explained that he had not applied for other jobs because "there ain't a lot I can do. I get short winded, my legs hurt and they burn on the sides when I walk a lot. And my back hurts all the time. And my left arm, it's numb from my shoulder to my fingers…. And when I close my hands, they pop every time I close them." (Tr. 40-41).

Prior to his alleged date of onset, Plaintiff worked at Paradise Swimming Pools for approximately six years as the tile crew leader. (Tr. 41, 43). When that company went out of business, he did not immediately look for another job because "my back was hurting and stuff. Then my mom went in the hospital . . . . And I stayed around to help her out, do the housework and everything, take care of her." (Id.). Plaintiff did not believe he could do tile work anymore

2

because he "couldn't get down on my knees like that." (Tr. 42). Plaintiff also had experience working for a fencing company and doing yard maintenance. (Tr. 43-44).

In regard to his impairments, Plaintiff testified that he experienced chest pain "[w]hen I get over-exerted[.]" (Tr. 45). The pain felt like "pressure" in the middle of his chest, and he would take a nitroglycerine pill before it reached "the point where an elephant's sitting on [his] chest[.]" (Tr. 46). Plaintiff experienced the chest pain two to three times a week, and it generally took forty-five minutes to resolve. (Id.). He rated the chest pain as an eight or nine on a ten-point scale. (Tr. 47). Plaintiff's doctors had not placed any restrictions upon his physical activity. (Tr. 50).

Plaintiff's primary care physician, Dr. Winterberger, was treating his neck pain. (Tr. 62). Plaintiff stated that she mentioned referring him to a pain clinic, but "I told her I couldn't afford to go there." (Id.). In addition, Plaintiff stated that his left arm "always feel[s] like it's asleep from my shoulder down....[t]o my fingers." (Id.). He occasionally experienced this sensation in his right arm, as well. (Tr. 48). He rated this pain as an eight and stated that the medication prescribed by his primary care physician did not help. (Tr. 49). Plaintiff later testified that, when he tried to work on his car, "I can use a ratchet then I just – my hand will go cramping on me and I just drop it." (Tr. 60). Plaintiff also had difficulty writing but was able to do buttons and zippers. (Tr. 61). Plaintiff could use his hands for "[a]bout an hour or two" before they became "a problem." (Tr. 61).

Plaintiff stated that the sides of his legs "burn when I walk, or if I'm on them for a long time," by which he meant "two, three hours." (Tr. 49). The pain was a ten and it would "take[] about an hour to hour and a half before it goes away. And that's with sitting down, rubbing them, with them elevated." (Id.).

3

In regard to his respiratory problems, Plaintiff stated he had a "breathing obstruction" attributable to COPD or emphysema, and his primary care physician prescribed him inhalers. (Tr. 53). He also suffered heartburn and high blood pressure, which he controlled with medication. (Tr. 54).

Plaintiff's medication made him sleepy and his symptoms remained "[a]bout the same." (Tr. 50). Plaintiff also experienced dizziness when he bent over. (Tr. 51). Plaintiff saw his primary care physician and cardiologist regularly. (Tr. 50). He continued to smoke three or four cigarettes per day. (Tr. 52). When the ALJ asked whether Plaintiff used marijuana, he answered, "no," but upon further questioning, responded: "Well, I've tried it. I mean it helps my back but I don't smoke it, you know, every day or nothing like that." (Tr. 52).

Plaintiff testified that he "could probably stand for about an hour" and was able to walk 300 to 400 feet. (Tr. 54). He was able to carry "about 20, 30 pounds, if that," stoop "a little bit," and crawl, but he could not kneel. (Tr. 54, 55). On a typical day, he would "help [his] mom fix breakfast, and help her clean the house." (Tr. 55). When the ALJ asked about housework, he stated, "I'm taking out trash, trying to vacuum, do the dishes and helping [his mom] with the [sic] cooking supper." (Tr. 56). Housework generally took him three or four hours. (Id.). He also mowed the yard, but "it takes me a long time to mow the yard. I get out of breath mowing it. I have to sit down for a while." (Tr. 55). Plaintiff shopped for groceries once a month and it took him a couple hours. (Tr. 56).

Plaintiff testified that he "used to go deer hunting, but I don't, no more. I can't hoof it up and down them hills." (Tr. 57). He was still able to shoot a rifle and occasionally shot targets on his nephew's property. (Tr. 57-58). Plaintiff estimated he spent approximately three to four

hours per day watching television, and often went next door to his sister's house to use her computer for about an hour at a time. (Tr. 58-59).

A vocational expert also testified at the hearing. (Tr. 63-72). The ALJ asked the vocational expert to consider a hypothetical individual of Plaintiff's age and education with the ability to "lift or carry occasionally 30 pounds, 20 pounds frequently[,]…stand and or walk up to four hours, sit up to six hours[,]" occasionally stoop, kneel, crouch, and crawl, but never climb ramps, ropes, ladders, or scaffolds. (Tr. 65). Additionally, the individual could not be exposed to machinery, extreme cold, or pulmonary irritants, such as fumes, odors, dust, or grass. (Id.). The ALJ testified that such individual could not perform Plaintiff's past work, however he could perform sedentary jobs such as order clerk, addresser, or bench hand. (Tr. 66-68). Adding a restriction of no kneeling would not affect the individual's ability to perform those three jobs, but a need to be "15 percent off task due to time to elevate legs, and rest in addition to normally scheduled lunches and breaks" would preclude all work. (Tr. 69-70).

In a decision dated February 3, 2015, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 404.1520[4] and found that Plaintiff "last met the insured status requirements of the Social Security Act on December 31, 2013" and that he "did not become disabled within the meaning of the Social Security Act during the October 24, 2012 to December 31, 2013 period." (Tr. 13). The ALJ found that, during the October 24, 2012 to December 31, 2013 period, Plaintiff had the severe impairments of ischemic heart disease, chronic obstructive pulmonary disease, and obesity. (Tr. 15). In regard to Plaintiff's degenerative disc disease, the

---

[4] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

ALJ stated that Plaintiff did not become symptomatic until late 2014 and, even if that condition existed during the relevant period, it was not severe because Plaintiff's "musculoskeletal and neurological exams performed by treating physicians in this period demonstrated that he had normal results." (Id.).

After reviewing Plaintiff's testimony and medical records, and finding that Plaintiff "lacks credibility," the ALJ determined that, from October 24, 2012 through December 31, 2013, Plaintiff had the residual functional capacity (RFC) to:

> [l]ift or carry thirty pounds occasionally and twenty pounds frequently, sit six hours in an eight-hour day, and stand and/or walk a total of four hours in an eight-hour day, but he required an at-will sit/stand option and he could not: climb ladders, ropes, scaffolds, or stairs; stoop, crouch, kneel or crawl more than occasionally; have concentrated exposure to pulmonary irritations; or have any exposure to hazardous machinery and extreme cold.

(Tr. 17). Finally, the ALJ found that, although Plaintiff was unable to perform his past relevant work, a "significant number of jobs existed for [Plaintiff] in the national economy during the October 24, 2012 to December 31, 2013 period[.]" (Tr. 18).

## II. *Standard of Review*

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680

F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the SSA. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III. *Discussion*

Plaintiff claims that substantial evidence did not support the ALJ's determination that he was not disabled between October 24, 2012 and December 31, 2013 because the ALJ: (1) neither cited evidence supporting the RFC nor weighed the medical opinions; (2) failed to properly evaluate his obesity; and (3) erred in evaluating his credibility. (ECF No. 18). Defendant counters that the ALJ properly evaluated Plaintiff's credibility and determined his RFC. (ECF No. 23).

#### A. *Credibility*

The Court will first consider the ALJ's credibility determination, as the ALJ's evaluation of a plaintiff's credibility influences the RFC determination. See, e.g., Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) ("The ALJ must first evaluate the claimant's credibility before determining a claimant's RFC."). Plaintiff claims the ALJ improperly evaluated his credibility. (ECF No. 18). In response, Defendant asserts that substantial evidence supported the ALJ's determination that Plaintiff lacked credibility. (ECF No. 23).

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).

First, the ALJ considered Plaintiff's activities of daily living, stating: "[H]e has been able to take care of his ill mother, tend to his personal needs, prepare meals, wash dishes, vacuum, launder clothes, take out trash, drive, grocery shop, target shoot and mow his yard." (Tr. 17). The ALJ reasoned that such activities "indicate a good ability to stand, walk, lift considerable weight and otherwise function." (Id.). While Plaintiff correctly asserts that an ability to perform sporadic, light activities does not demonstrate an ability to perform full-time, competitive work, a claimant's daily activities that are inconsistent with his subjective complaints may support an adverse credibility determination.[5] See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013) (ALJ properly discounted plaintiff's credibility where, among other factors, plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cook[ing], tak[ing] care of his dogs, us[ing] a computer, driv[ing] with a neck brace, and shop[ping] for groceries with the use of an electric cart").

Second, the ALJ noted that Plaintiff's "shortness of breath with exertion has been [in] existence since 2003 and his obesity has been [] longstanding." (Tr. 17). The ALJ explained that, given the duration of these impairments and the absence of evidence of significant deterioration, "these conditions cannot reasonably be considered disabling on or before the date last insured when the claimant engaged in substantial gainful activity despite them." (Id.).

---

[5] To the extent Plaintiff urges the Court to reweigh the evidence relating to his activities of daily living, the Court declines to do so. See Baldwin v. Barnhart, 349 F.3d 549, 555 (8th Cir. 2003) ("We do not reweigh the evidence presented to the ALJ[.]") (internal quotation omitted).

Evidence of employment during a period of alleged disability may be probative of claimant's ability to work. 20 C.F.R. § 404.1571 ("The work ... that [a claimant has] done during any period in which [he] believe[s] [he is] disabled may show that [he is] able to work at the substantial gainful activity level."). See also Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir.2004) ("It was also not unreasonable for the ALJ to note that [the plaintiff's] daily activities, including part-time work ... were inconsistent with her claim of disabling pain.").

Finally, the ALJ considered Plaintiff's inconsistent statements. For example, the ALJ noted that Plaintiff's testimony relating to the intensity and duration of his chest pain (two to three times per week for about forty-five minutes) contradicted his statements to Dr. Ahmad at two appointments in 2014 and the state agency consulting physician in March 2013. (Tr. 17). See e.g., Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) (contradictions between the plaintiff's testimony and what he told physicians weighs against the plaintiff's credibility). In addition, Plaintiff's admission that he could lift up to thirty pounds undermined his testimony relating to the intensity and frequency of his symptoms. (Tr. 17). See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) ("Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony."). Finally, the ALJ noted Plaintiff was not forthcoming about his marijuana use and his "earnings record also suggests a poor work ethic as it often shows low or no annual earnings."[6] (Tr. 17-18).

---

[6] In his brief, Plaintiff appears to suggest that the ALJ erred in finding both a history of substantial gainful activity and a poor work history. (ECF No. 18 at 6). However, these findings are not inherently inconsistent. "A lack of work history may indicate a lack of motivation to work rather than a lack of ability." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Plaintiff's earnings records reveal no annual earnings in 1986, 1987, 1991, 1993, 1996, 1997, 1999, 2002, and 2009 through 2013. (Tr. 162). As Defendant points out in her brief, "Plaintiff earned only $3,891.83 from the year he turned 18-years old (1986) through 1999." (ECF No. 23 at 10). The records also demonstrate that, despite already-existing obesity and shortness of breath, Plaintiff maintained his employment as a tile crew leader for approximately six years,

Based on the above, the Court finds that substantial evidence supported the ALJ's determination that Plaintiff was not entirely credible. Because the ALJ provided "good reasons" for discrediting Plaintiff's testimony, the Court defers to the ALJ's credibility determination. See Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011).

*B. RFC determination*

Plaintiff argues that the ALJ erred in formulating his RFC because she did not adequately explain how the medical evidence supported her findings. (ECF No. 18). In response, Defendant contends that the ALJ properly considered the evidence of record and substantial evidence supported the RFC determination. (ECF No. 23).

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quoting Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. However, there is no requirement that an RFC finding be supported by a specific medical opinion." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (internal quotations and citations omitted). The claimant bears the burden of proving disability and demonstrating his or her RFC. Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011).

In this case, the RFC formulated by the ALJ is supported by substantial evidence in the record as a whole. Plaintiff's medical records reveal that on October 24, 2012, Plaintiff suffered

---

from 2003 through 2008. (Tr. 162). The ALJ did not err in finding evidence of both an ability to work despite impairments and a lack of desire to work.

a myocardial infarction and underwent a heart catheterization and stenting. (Tr. 265-72). When Plaintiff followed up with a cardiologist, Dr. Farhaan Ahmad, on November 20, 2012, he reported "continued chronic dyspnea on exertion" and stated that he continued to smoke cigarettes, "has not had any further chest discomfort," and "is currently tolerating his medications." (Tr. 255). Dr. Ahmad noted that Plaintiff's blood pressure was well-controlled on metropolol and lisinopril, and he advised Plaintiff to lose weight, stop smoking, and return for a follow-up visit in six months. (Tr. 256).

On March 15, 2013, Dr. Barry Burchett performed a consultative medical examination for Plaintiff. (Tr. 313-19). Plaintiff informed Dr. Burchett that he experienced "two to three episodes per month of substernal heavy chest discomfort that is related to exertion," and he stated that these episodes generally lasted for fifteen or twenty minutes and improved when he took nitroglycerin. (Tr. 313). In addition, Plaintiff informed Dr. Burchett that he "has had trouble with the left knee for about 10 years" and "trouble with his lower back since the 1980s." (Tr. 314). He had never had x-rays of either his knee or back. (Tr. 314). Dr. Burchett noted that: Plaintiff had "morbid obesity"; the examination of Plaintiff's chest, heart, spine, and lower extremities were unremarkable; and Plaintiff was able to walk fifty feet without assistance and perform a single full squat without difficulty. (Tr. 316). Dr. Burchett diagnosed Plaintiff with: emphysema; coronary heart disease, status post coronary angioplasty, probable stable chronic angina; recurrent low back pain, without radiculopathy; probable osteoarthritis of the left knee; GERD; and hypertension. (Tr. 316).

Plaintiff returned to Dr. Ahmad's office for a follow-up appointment on May 9, 2013. (Tr. 359-61). Plaintiff reported "recent symptoms of exertional dyspnea and chest pain, particularly when mowing his lawn. The pain is substernal in location and can also occur

11

following 30-45 minutes of exercise. The pain is relieved with nitroglycerin and rest." (Tr. 359). Plaintiff also complained of chronic lower back pain. (Id.). Dr. Ahmad continued Plaintiff on Plavix and ordered a stress test. (Tr. 360). The results of Plaintiff's stress test were generally normal except for "[m]inimal generalized symptoms . . . quickly subsiding in the recovery stage without treatment." (Tr. 362).

At his next follow-up appointment with Dr. Ahmad on November 12, 2013, Plaintiff reported "recurrent, frequent episodes of substernal chest pain with radiation to his right arm." (Tr. 354). Plaintiff also complained of bilateral burning and numbness with exertion. (Id.). Dr. Ahmad ordered a left heart catheterization with possible PCI, which was performed on November 15, 2013. (Tr. 356). Plaintiff's cardiac study revealed "[s]evere in-stent restenosis of the mid RCA, correlating with a markedly abnormal FFR of 0.77," and a surgeon performed a "[s]uccessful PCI to the mid RCA . . . with a drug-eluting stent." (Tr. 332). Plaintiff's surgeon recommended Plaintiff continue taking aspirin and Plavix, lose weight, and stop smoking. (Id.).

When Plaintiff followed up with Dr. Ahmad on December 12, 2013, Plaintiff reported that his "chest discomfort symptoms have resolved" but he continued to experience chronic dyspnea symptoms and bilateral leg burning with ambulation. (Tr. 349). Dr. Ahmad ordered a pulmonary function test and lower extremities ABIs. (Tr. 351-52).

When Plaintiff returned to Dr. Ahmad's office in April 2014 (several months after Plaintiff's December 31, 2013 date last insured), he informed Dr. Ahmad that he was unable to afford the pulmonary function test or albuterol inhaler and was experiencing "left leg pain with ambulation and reports that his knee gives out at times and he falls." (Tr. 345). Dr. Ahmad noted that Plaintiff "denies any angina symptoms, but continues to have chronic dyspnea and

fatigue, which I suspect is primarily related to underlying COPD and obesity." (Tr. 347). Dr. Ahmad continued Plaintiff's prescription of Plavix. (Id.).

In her decision, the ALJ summarized the treatment notes, clinical observations, and medical test results. (Tr. 16-17). The ALJ stated that, following Plaintiff's heart attack and stenting in October 2012, Plaintiff "had severe residual disease of a small posterior descending artery," yet "an echocardiogram that the claimant underwent soon after the stenting revealed that he had normal systolic function and mild left ventricular hypokinesis." (Tr. 16). The ALJ found it significant that Plaintiff visited Dr. Ahmad only twice between November 2012 and October 2013. (Id.). Although Plaintiff continued to experience dyspnea during exertion, the cardiovascular exams performed by Dr. Ahmad and Dr. Burchett were normal and his May 2013 stress test showed "normal results except for minimal, generalized symptoms." (Id.). The ALJ noted that Plaintiff's chest pain worsened in November 2013 but resolved after he underwent a stent implant later that month, and testing in December 2013 and April 2014 produced normal results. (Tr. 16-17).

The ALJ also discussed Plaintiff's medical records relating to his obesity and COPD. (Tr. 17). The ALJ noted that Plaintiff "regularly experienced dyspnea on exertion," which Dr. Ahmad determined was "partly due to obesity." (Tr. 17). However, "a May 2013 pulmonary function test revealed that the claimant had normal results even before the use of a bronchodilator, and respiratory exams performed in the pre-2014 period demonstrated that he had normal results except for diminished breath sounds on one occasion." (Id.). The medical records cited by the ALJ support her finding that, despite Plaintiff's impairments, he did not become disabled between October 24, 2012 and December 31, 2013.

13

Plaintiff complains that the ALJ formulated the RFC in the absence of an RFC determination from a medical source. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley, 829 F.3d at 932 (quoting Cox , 495 F.3d at 619). However, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the [plaintiff's] physicians." Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (internal citations omitted). In other words, the ALJ uses medical sources to "provide evidence" about several factors, including RFC, but the "final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 416.927(d)(2). Moreover, "[i]t is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall, 274 F.3d at 1217.

Plaintiff also asserts that the ALJ erred in failing to specify the weight assigned the medical opinion evidence.[7] The regulations require that an ALJ "give good reasons" for discounting a treating physician's opinion. Dolph v. Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2002) (citing 20 C.F.R. § 404.1527(d)(2)). Here, the ALJ did not discount the medical opinion evidence, as the medical opinion evidence directly supports the RFC. Even assuming it was an error not to assign specific weights to the medical opinions, it was non-prejudicial and does not justify reversal. See Hensley, 829 F.3d at 932 ("[A]n arguable deficiency in opinion writing that had no practical effect on the decision ... is not a sufficient reason to set aside the ALJ's decision.") (quotation omitted).

---

[7] Plaintiff also asserts that that the ALJ erred in failing to discuss the SSA single decision-maker's RFC assessment. (ECF No. 18 at 4). Single decision-makers' opinions are not acceptable medical sources entitled to consideration under the Social Security regulations. See § 404.1513. Fiala v. Berryhill, No. 4:15CV1501 CDP, 2017 WL 976933, at *16 n. 6 (E.D.Mo. March 13, 2017). See also Dewey v. Astrue, 509 F.3d 447, 449 (8th Cir. 2007).

To the extent Plaintiff challenges the ALJ's failure to cite medical records in setting forth the RFC, "an ALJ is not required to list each function which she includes in a claimant's RFC, followed by the specific medical evidence which supports a finding that the claimant can engage in that function." Murphy v. Berryhill, 2:15cv69 NCC, 2017 WL 1132345, at *7 (E.D.Mo. March 27, 2017). Based on the above, the Court concludes that the record contained substantial evidence to support the ALJ's RFC assessment.

*C. Obesity*

In his final argument, Plaintiff claims the ALJ failed to properly evaluate his obesity because she "did not explain how the Plaintiff's obesity affects his RFC." (ECF No. 18 at 4-5). In response, Defendant asserts that "the ALJ found Plaintiff's obesity was a severe impairment, specifically discussed Plaintiff's obesity in her RFC analysis, and explained the evidence she considered regarding his obesity in relation to his breathing problems upon exertion." (ECF No. 23 at 12).

The SSA recognizes that "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately." 20 C.F.R. § 404, Subpt. P, App'x 1, § 1.00(Q). See also SSR 02–1p, 2002 WL 34686281, at *3 (Sept. 12, 2002). Thus, at all stages of the sequential evaluation process, including the RFC determination, "adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R. § 404, Subpt. P, App'x 1, § 1.00(Q). However, the United States Court of Appeals for the Eighth Circuit has held that "[w]hen an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (quoting Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009)).

Here, the ALJ found that Plaintiff's obesity was a severe impairment and referenced obesity when formulating the RFC. (Tr. 15). At step three of the sequential evaluation process, the ALJ noted that, according to Plaintiff's pre-2014 medical records, Plaintiff "had a body mass index of no less than 50.4" and "regularly experienced dyspnea on exertion," which his cardiologist believed "was partly due to obesity." (Tr. 17). The ALJ accounted for Plaintiff's obesity, in combination with his other severe impairments, in the RFC by including a sit/stand option and limiting Plaintiff to lifting or carrying twenty pounds frequently and thirty pounds occasionally, sitting six hours in an eight-hour day, and standing and/or walking four hours in an eight-hour day. (Tr. 16). The ALJ explained: "In formulating the above restrictions, I gave the claimant the benefit of the doubt regarding restrictions due to his cardiovascular disease, developing lung disease, and obesity." (Tr. 16).

Although Plaintiff argues that the ALJ failed to include in the RFC limitations relating to his obesity, he does not identify any functional restrictions caused by obesity, nor does he point to any medical evidence supporting the imposition of greater limitations. The Court finds that the ALJ properly accounted for Plaintiff's obesity when formulating the RFC. "Because the ALJ specifically took [Plaintiff's] obesity into account in his evaluation, we will not reverse that decision." Heino, 578 F.3d at 881-82.

### III. *Conclusion*

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

　　　　　　　　　　　　　　　　　　　　/s/ Patricia L. Cohen
　　　　　　　　　　　　　　　　　　　　PATRICIA L. COHEN
　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of May, 2017